# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASYIA ANDREWS, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>BEECH-NUT NUTRITION COMPANY,<br><br>　　　　　　Defendant.<br><br><br>This Document Relates To:<br>*In Re: Beech-Nut Nutrition Company Baby Food Litigation*,<br>*Thomas et al. v. Beech-Nut Nutrition Co.*,<br>Case No. 2:21-cv-0133-TJM-CHF | CLASS ACTION COMPLAINT<br><br>CIVIL ACTION NO: 1:21-CV-0815 (TJM/CFH)<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Asyia Andrews ("Andrews" or "Plaintiff"), on behalf of herself and all others similarly situated, by and through her undersigned attorneys, alleges against Beech-Nut Nutrition Company ("Beech-Nut" or "Defendant"), the following facts based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## NATURE OF THE ACTION

> *Baby food manufacturers hold a special position of public trust.*
> *Consumers believe that they would not sell unsafe products.*
> *Consumers also believe that the federal government would not*
> *knowingly permit the sale of unsafe baby food...baby food*
> *manufacturers and federal regulators have broken the faith.*[1]

1.      The health and safety of infants and children are of the utmost importance.  Yet, Defendant, the baby food manufacturer, who vowed to protect and keep them safe, recklessly disregarded the safety, health, and wellbeing of millions of babies, toddlers, and children by knowingly selling baby food products containing dangerous amounts of toxic heavy metals: inorganic arsenic, lead, cadmium, and mercury (hereinafter collectively referred to as "Toxic Heavy Metals").  Toxic Heavy Metals are particularly hazardous to infants and children because they are developmental neurotoxins, meaning that exposure can significantly harm a baby's developing brain and nervous system, both in utero and after birth.  The effects often cause permanent loss of intellectual capacity, behavioral issues, such as Attention-Deficit/Hyperactivity Disorder ("ADHD"), and intelligence quotient ("IQ") loss.

2.       Plaintiff put her trust in Defendant.  She relied on assurances from Beech-Nut that its baby food products were of the highest quality.   Most importantly, Plaintiff believed Defendant's representations that its baby food products were safe.  Yet, Defendant knowingly concealed all material information about Toxic Heavy Metals, internal and external testing results, and its products' hazards.  Defendant sacrificed the health and safety of infants, children, parents, and caregivers, to increase corporate revenue.  Defendant lied to Plaintiff and millions of

---

[1] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "**Congressional Report**") (Feb. 4, 2021) (https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf) (last visited on July 7, 2021), attached hereto as **Exhibit A**.

consumers and broke their trust and faith, by actively marketing and selling baby food products as safe while Defendant knew that its products were unsafe and contained dangerous amounts of Toxic Heavy Metals but decided to sell the products to parents anyway.

3.     Plaintiff brings this class action on behalf of herself, a proposed nationwide class, and a proposed New Jersey subclass.  The nationwide class is defined as follows: All persons who purchased one or more of Defendant's products containing Toxic Heavy Metals, in the United States for personal/household use (hereinafter the "Nationwide Class").  The New Jersey subclass is defined as follows: All persons residing in New Jersey who purchased one or more of Defendant's products containing Toxic Heavy Metals for personal/household use (hereinafter the "Subclass").[2]  Plaintiff and members of the Class seek injunctive and monetary relief based on Defendant's false advertising scheme and deceptive business practices in violation of consumer protection laws.

4.     In April 2019, Healthy Babies Bright Futures, an alliance of nonprofit organizations, that actively work together to reduce babies' exposures to toxic chemicals ("Healthy Babies Bright Futures"), issued a report detailing the evaluation of 168 containers of various baby food products that lead to the disturbing revelation that 95% of the 168 products tested contained one or more Toxic Heavy Metals.[3]  Healthy Babies Bright Futures found that the samples had heavy metals, including arsenic, lead, mercury, and cadmium. Healthy Babies Bright Future's report stunned lawmakers and individuals throughout the county.

5.     Shortly thereafter, on November 6, 2019, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform

---

[2] The Nationwide Class and Subclass are collectively referred to herein as "Class" unless otherwise noted.
[3] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (Dec. 2017) (https://www.healthybabycereals.org/sites/healthybabycereals.org/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on July 7, 2021).

("Congressional Subcommittee") opened an investigation, and requested internal documents and test results from seven of the largest baby food manufacturers in the United States: (1) Beech-Nut, (2) Hain, which sells products under the name "Earth's Best Organic", (3) Gerber, (4) Walmart, Inc., which sells products through its private brand Parent's Choice (hereinafter "Walmart"), (5) Sprout Foods, Inc., which sells food under the name Sprout Organic Food (hereinafter "Sprout"), (6) Campbell Soup Co., which sells baby food under the name Plum Organics (hereinafter "Campbell"), and (7) Nurture, Inc., which sells baby food under the names "HappyFamily Organics," "HappyBABY," and HappyTOT (hereinafter "Nurture" or "HappyBABY").[4]

6.      In response to the Congressional Subcommittee's request, Beech-Nut produced its internal testing policies and test results for both ingredients and finished products.  Beech-Nut also produced documentation regarding its testing and quality assurance programs, including information related to Beech-Nut's policies when its testing of ingredients or finished products exceeded the internal standards for Toxic Heavy Metals.

7.      Subsequently, on February 4, 2021, the Congressional Subcommittee published a detailed report, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "Congressional Report") exposing Beech-Nut's reckless disregard for the health and safety of babies by knowingly selling baby food products with dangerously elevated levels of Toxic Heavy Metals.  The Congressional Report also determined:

a.   Industry self-regulation fails to protect consumers as Defendant set its own dangerously high internal standards for Toxic Heavy Metals,

b.   Defendant routinely ignored internal standards and continued to sell products with even higher Toxic Heavy Metals levels, and

---

[4] *See* **Exhibit A** at p.  2.

c. Defendant's prevalent practice of only testing individual ingredients that are included in its products instead of the finished product concealed even higher levels of Toxic Heavy Metals in finished baby food products.

8. The Beech-Nut products at issue include products that contained any the following ingredients: Cinnamon, Organic Cumin, Organic Coriander, Oregano, Alpha Amylase, Organic Lemon, Turmeric, Sunflower Lecithin, Sweet Potato, Quinoa Flower, Prune Puree, Dehydrated Potato, Mango, Sebamyl 100, Apricot, Enzyme, Organic Quinoa Seeds, Blueberry, Carrots, Organic Pears; and the following products: Beech-Nut Rice Single Grain Baby Cereal; Beech-Nut Oatmeal Whole Grain Baby Cereal; Beech-Nut Classic Sweet Carrots; Beech-Nut Organics Carrots; Beech-Nut Naturals Sweet Potatoes; Beech-Nut Classics Sweet Potatoes; Beech-Nut Classics Sweet Peas; Beech-Nut Naturals Butternut Squash; Beech-Nut Organics Pumpkin; Beech-Nut Organics Apples; Beech-Nut Naturals Bananas; Beech-Nut Naturals Beets, Pear & Pomegranate; Beech-Nut Classics Mixed Vegetables; Beech-Nut Breakfast On-the-Go Yogurt, Banana & Mixed Berry Blend; Beech Nut Organics Sweet Potatoes; Beech-Nut Organics Pears; Beech-Nut Organics Apple Kiwi & Spinach; Beech-Nut Naturals Carrots; Beech-Nut Organics Pear Kale & Cucumber; Beech-Nut Oatmeal Whole Grain Baby Cereal; Beech-Nut Rice Single Grain Baby Cereal; Beech-Nut Banana Stage; Beech-Nut Sweet Peas Stage 2; Beech-Nut Carrots Stage 2; Beech-Nut Green Beans Stage 2; Beech-Nut Sweet Potatoes Stage 2; Beech-Nut Apple Stage 2 (hereinafter collectively referred to as the "Baby Food Products").

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 (hereinafter referred to as "CAFA") codified as 28 U.S.C. § 1332(d)(2), because the

aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; the number of members of the proposed Class exceeds 100; and the Plaintiff and members of the proposed Class are citizens of a state different than Defendant.

10.     This Court has personal jurisdiction over Defendant because its headquarters are in the State of New York, it regularly conducts business in this District, has extensive contacts with this forum, and because the advertising, labeling, packing, manufacturing, sale, and distribution of Beech-Nut's Baby Food Products and the misrepresentations, misleading remarks, and/or deceptive acts associated thereto, occurred, developed, or were initiated in New York.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this District, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

12.     Plaintiff Asyia Andrews is a resident of New Jersey.  Plaintiff purchased Beech-Nut's Baby Food Products from Target, Shoprite, and Amazon Fresh in various locations around her home in Union County, New Jersey.  Plaintiff regularly purchased these products since 2020 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies.  Plaintiff's purchases took place when third-party testing showed that Defendant's Baby Food Products contained harmful heavy metals.  Plaintiff would not have purchased the products if she had known that the products were unsafe and unsuitable for babies, contained heavy metals, the levels of heavy metals in the products, testing results showed these

products contained harmful levels of Toxic Heavy Metals, or that the Defendant's policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

13.     Defendant Beech-Nut is incorporated in New York.  Its headquarters and principal place of business is located at One Nutritious Place, Amsterdam, New York 12010.

14.     Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells the Baby Food Products under the baby food brand names Beech-Nut throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for the Baby Foods, relied upon by Plaintiff were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein.  The marketing, advertising, packaging, and labeling for the Baby Food Products were designed to encourage consumers to purchase the Baby Food Products and reasonably misled the reasonable consumer, i.e., Plaintiff and the Class, into purchasing the Baby Food Products.  Defendant owns, manufactures, and distributes the Baby Food Products, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Baby Foods.  Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished Baby Food Products.

## FACTUAL ALLEGATIONS

**I.     THE DANGERS OF TOXIC HEAVY METALS TO CHILDREN'S HEALTH IS WELL DOCUMENTED.**

15.     The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared Toxic Heavy Metals dangerous to human health, particularly to babies and children, who are at the greatest risk of harm and most vulnerable to their neurotoxic effects.[5]

16.     Decades of scientific studies examining the dangers of Toxic Heavy Metals demonstrate the harmful effects of inorganic arsenic, lead, cadmium, and mercury.  Specifically, studies show that even low levels of exposure to Toxic Heavy Metals cause developmental problems in babies and children, which result in permanent decreases in IQ and economic productivity and increased risk of behavioral issues and criminal tendencies.[6]  For every IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000.[7]

17.     In 2012, the National Institute of Environmental Health Services ("NIEHS"), through its Superfund Research Program ("SRP") and NIEHS/EPA Centers for Children's Environmental Health and Disease Prevention Research ("NIEHS/EPA"), added to the growing evidence supporting the regulation of arsenic by establishing that the levels of arsenic consumed in the study were at least two or three times more than the acceptable limits set for drinking water by the U.S. Environmental Protection Agency ("EPA").[8]  Most importantly, the studies showed that baby foods, including rice cereal, contain levels of arsenic that pose a significant risk to the

---

[5] Food and Drug Administration, *Metals and Your Food* (www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (last visited on July 7, 2021).

[6] *Id.*

[7] Martine Bellanger et al., *Economic Benefits of Methylmercury Exposure Control in Europe: Monetary Value of Neurotoxicity Prevention* (Jan. 17, 2013) (https://pubmed.ncbi.nlm.nih.gov/23289875/).

[8] Gilbert-Diamond D, et al., *Rice consumption contributes to arsenic exposure in U.S. women* (Dec. 20, 2011) (https://pubmed.ncbi.nlm.nih.gov/22143778/) (last visited on July 7, 2021).

health of babies and children,[9] and identified baby food as a potential source of arsenic exposure.[10] "Groups at potentially greatest risk are toddlers who are fed a rice syrup-based toddler formula, and potentially people who are following a gluten-free diet."[11]

18.     Infants and children are particularly vulnerable to Toxic Heavy Metals' effects because their organs are still developing.  Exposure to Toxic Heavy Metals during a baby's developmental stage can lead to "'untreatable and frequently permanent brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[12]

19.     The American Academy of Pediatricians ("AAP") and the National Toxicology Program in the National Institutes of Health ("NTP/NIH") both determined that, in young children, "even very low blood lead levels are associated with lower academic achievement, IQ, and greater incidence of attention-related behaviors and problem behaviors."[13]   Peer-reviewed literature further confirms that arsenic exposure is associated with health risks related to developing respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological issues, as well as damaging effects on the central nervous system and cognitive development in children and increased risk of developing ADHD.[14]

20.     Lead exposure presents similar long-term cognitive defects and an increased risk of developing other conditions or disorders.  As recognized by the Congressional Subcommittee, risks of

---

[9] Jackson BP, Taylor VF, Punshon T, Cottingham KL., *Arsenic concentration and speciation in infant formulas and first foods*. PURE APPL CHEM. 84(2):215-223 (2012) (https://pubmed.ncbi.nlm.nih.gov/22701232/) (last visited on July 7, 2021).
[10] Jackson BP, Taylor VF, Karagas MR, Punshon T, Cottingham KL., *Arsenic, Organic Foods, and Brown Rice Syrup.*, ENVIRON HEALTH PERSPECT (2012); (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3346791/) (last visited on July 7, 2021).
[11] Spivey, A., *Studies find arsenic in food adds up,* National Institute of Environmental Health Services (Mar. 2012) (https://factor.niehs.nih.gov/2012/3/science-arsenic/index.htm) (last visited on July 7, 2021).
[12] **Exhibit A** at p. 9.
[13] Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911/) (emphasis added) (last visited on Mar. 19, 2021).
[14] *See* Environmental Defense Fund, *EDF Report Finds Lead in 1 in 5 Baby Food Samples,* (June 15, 2017) (https://www.edf.org/media/edf-report-finds-lead-1-5-baby-food-samples) (last visited on July 7, 2021).

exposure to lead are directly associated with "behavioral problems, decreased cognitive performance, delayed puberty, reduced postnatal growth," and ADHD development.[15]

21.     Cadmium is a known neurotoxin.  Exposure to cadmium increases the risk of developing kidney damage, decreases bone density, and damages the respiratory and skeletal systems.[16]

22.     Mercury, as explained by the WHO, "may have toxic effects on the nervous, digestive, and immune systems, and on lungs, kidneys, skin, and eyes."[17]

> **A.**     <u>**There Is No Established Safe Level of Inorganic Arsenic Consumption for Babies.**</u>

23.     Arsenic is classified by the International Agency for Research on Cancer ("IARC") as a Group 1 carcinogen.[18]  Its harmful effects are also recognized by the WHO, which lists arsenic as one of the top ten chemicals of major public concern.  The Agency for Toxic Substances and Disease Registry ("ATSDR") recognizes arsenic as the number one substance to pose the most significant threat to human health.[19]  The inorganic forms of arsenic, referred to as arsenite and arsenate, are water-soluble and found in rice.

24.     The known health hazards associated with arsenic exposure include damage to neurodevelopment, cognitive development, respiratory system, and other neurological and immunological effects.[20]  "Studies have concluded that arsenic exposure has a "significant

---

[15] <u>**Exhibit A**</u> at p. 11.
[16] WHO, *Cadmium,* (2019) (https://www.who.int/ipcs/assessment/public_health/cadmium/en/) ) (last visited on July 7, 2021).
[17] Laura Reiley, N*ew Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, THE WASHINGTON POST (Feb. 4, 2021),
https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/)  (last visited on July 7, 2021).
[18] https://monographs.iarc.who.int/list-of-classifications (last visited on July 7, 2021).
[19] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on July 7, 2021).
[20] <u>**Exhibit A**</u> at p. 11.

negative effect on neurodevelopment in children."[21]   The most negative effects are seen in verbal performance and memory.  It is estimated that for every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."[22]

25.     Published guidelines issued by the WHO permit levels of arsenic in drinking water up to 10 parts per billion ("ppb").  Similarly, the FDA and EPA recognize the harmful effects of arsenic and have set standards limiting consumption levels to 10 ppb.[23]

26.     In 2020, the FDA issued "Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants" stating that baby food products should not exceed arsenic levels of 100 ppb.[24] However, Defendant often distributes and sell products containing twice the amount of arsenic recommended by the FDA.

### B.     There Is No Established Safe Level of Lead Consumption for Babies.

27.     IARC classifies lead as a Group 1 carcinogen.[25]   Additionally, the ATSDR lists lead as the second most harmful substance that poses a significant threat to human health.[26]   Lead is also recognized by the WHO as a major public health concern.[27]

28.     Numerous governmental agencies, including the FDA, recognize the significant health effects that lead can have on children and infants.  High levels of lead exposure can seriously harm children's development and health, specifically the brain and nervous system.  Neurological

---

[21] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (https://pubmed.ncbi.nlm.nih.gov/23570911/) (last visited on July 7, 2021).
[22] *Id.*
[23] FDA, *Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level* (Apr. 2016) (https://www.govinfo.gov/content/pkg/FR-2016-04-06/pdf/2016-07840.pdf (last visited on July 7, 2021).
[24] FDA, Guidance for Industry: Action Level for Inorganic Arsenic in Rice Cereals for Infants (Aug. 2020), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-level-inorganic-arsenic-rice-cereals-infants  (last visited on July 7, 2021).
[25] https://monographs.iarc.who.int/list-of-classifications (last visited on July 7, 2021).
[26] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on July 7, 2021).
[27] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on July 7, 2021).

deficits from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Additionally, because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.[28]

29.     The EPA, WHO, the Centers for Disease Control and Prevention ("CDC") and the AAP unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia."[29] Moreover, numerous scientific studies establish a "significant association between early childhood lead exposure and decrease standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement."[30] Peer-reviewed studies also establish a significant association between lead exposure and ADHD.[31]

30.     Despite these well-known adverse health effects, the FDA fails to regulate levels of lead in Baby Food Products, allowing Beech-Nut to set its own limits, which often include exceedingly dangerous amounts.

---

[28] FDA, *Lead in Food, Foodwares, and Dietary Supplements* (www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (last visited on July 7, 2021).

[29] Congressional Report at p. 10; *see also*, Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited on July 7, 2021); https://www.epa.gov/lead/learn-about-lead; *see also*, Philippe Grandjean, *Even Low-Dose Lead Exposure Is Hazardous* (Sept. 11, 2010) (https://pubmed.ncbi.nlm.nih.gov/20833288/).

[29] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last visited on July 7, 2021).

[30] **Exhibit A** at p. 11 (internal citation omitted).

[31] *Id.*

C.    **There Is No Established Safe Level of Cadmium Consumption for Babies.**

31.    IARC classifies cadmium as a Group 1 carcinogen.[32]  Additionally, the ATSDR lists cadmium as the seventh most substance to pose the most significant threat to human health.[33] Further, the WHO recognizes cadmium as a major public health concern.[34]

32.    Cadmium has no physiological function in the human body and is a known neurotoxin.  Consumption of cadmium is associated with decrease in IQ and development of ADHD.[35]  Peer-reviewed literature documents the harmful effects cadmium exposure has on children's Full-Scale IQ, particularly in boys, who historically have fewer IQ points than other boys without cadmium exposure.[36]  Moreover, according to a new study led by Harvard University researchers, children with higher cadmium levels are three times more likely to have learning disabilities and participate in special education.[37]

33.    Despite well-known adverse health effects, the FDA fails to regulate levels of cadmium in Baby Food Products, allowing Beech-Nut to set its own limits, which dangerously exceed levels safe for consumption.

---

[32] https://monographs.iarc.who.int/list-of-classifications (last visited on July 7, 2021).
[33] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on July 7, 2021).
[34] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on July 7, 2021).
[35] *Id.* at p. 12.
[36] *Id.*
[37] Marla Cone, *Is Cadmium as Dangerous for Children as Lead?,* SCIENTIFIC AMERICAN (Feb. 2012), (https://www.scientificamerican.com/article/is-cadmium-as-dangerous-for-children-lead/) (last visited on July 7, 2021).

### D.     There Is No Established Safe Level of Mercury Consumption for Babies.

34.     The WHO warns that mercury "may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin, and eyes"[38] and considers mercury "one of the top ten chemicals or groups of chemicals of major public health concern." [39]

35.     Despite well-known adverse health effects, the FDA fails to regulate mercury levels in Baby Food Products, allowing Beech-Nut to set its limits, which dangerously exceed safe consumption.  Mercury is the number three substance on ATSDR's list of dangerous substances in the environment, potentially posing a significant threat to human health.  As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food.  Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water.  Similarly, the EPA set a limit of 2 ppb for all drinking water.  Additionally, a study that evaluated the published epidemiological research articles related to mercury exposure, determined that in the context of exposure in vitro, "mercury… has been consistently associated with subsequent adverse neuro-development."[40]

---

[38] WHO, *Mercury and health* (https://www.who.int/news-room/fact-sheets/detail/mercury-and-health#:~:text=Health%20effects%20of%20mercury%20exposure&text=The%20inhalation%20of%20mercury%20vapour,induce%20kidney%20toxicity%20if%20ingested) (last visited on July 7, 2021).
[39] WHO, *Lead Poisoning and Health* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last visited on July 7, 2021).
[40] Margaret R. Karagas, et al., E*vidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited on July 7, 2021).

II.     **BEECH-NUT'S BABY FOOD PRODUCTS CONTAIN DANGEROUS LEVELS OF TOXIC HEAVY METALS.**

A.      <u>**Beech-Nut's Baby Food Products Contain Arsenic.**</u>

36.     The Congressional Report states: "Internal company test records obtained by the Subcommittee confirm that all responding baby food manufacturers sold baby foods tainted by high levels of Toxic Heavy Metals."[41]

37.     There is no established safe level for inorganic arsenic consumption by babies.  The FDA, EPA, WHO, and European Union ("EU") have all set a maximum level of inorganic arsenic at 10 ppb.  Accordingly, the Congressional Subcommittee took this value into consideration during their analysis.[42]

38.     Health experts, including the AAP, Consumer Reports, and the Environmental Defense Fund ("EDF"), all advocated for a maximum level of 1 ppb instead of 10 ppb.  EDF is the world's leading nonprofit environmental group that focuses on environmental health hazards. Consumer Reports is a nonprofit organization that advocates for consumers and regarding Toxic Heavy Metals.

39.     Beech-Nut set an internal specifical limit of 3,000 ppb inorganic arsenic for certain ingredients, far surpassing any existing standard.[43]

40.     The Congressional Report determined Beech-Nut used ingredients in its Baby Food Products after testing results revealed that the ingredients contained as high as 913.4 ppb arsenic.[44] The Subcommittee further determined that Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."[45]

---

[41] <u>**Exhibit A**</u> at p. 13.
[42] *Id.*
[43] *Id.*
[44] *Id.* at p. 13.
[45] *Id.*

41.     The six Beech-Nut ingredients with the highest arsenic levels are all enzymes that Beech-Nut adds to its Baby Food Products.[46]  The below chart illustrates the top ten raw materials containing lead that Beech-Nut used as ingredients in its Baby Food Products:

*Beech-Nut, Raw Material Heavy Metal Testing (Excerpted Entries)*[45]

| Date | Commodity | Arsenic Result (ppb) | Spec. | Acceptance (Y/N) |
|------|-----------|----------------------|-------|------------------|
| 9/19/2018 | Amylase | 913.40 | N/A | Y |
| 4/26/2018 | Amylase | 741.10 | N/A | Y |
| 10/7/2017 | BAN 800 | 710.90 | <3000 | Y |
| 11/29/2017 | Alpha Amylase | 679.00 | N/A | Y |
| 10/12/2017 | Amylase | 645.10 | N/A | Y |
| 8/20/2019 | Sebamyl 100 | 583.60 | N/A | Y |
| 3/6/2018 | Org. Rice Flour | 570.00 | ≤100(inorg) | Y |
| 6/7/2019 | Enzyme | 499.30 | N/A | Y |
| 12/20/2017 | BAN 800 | 465.20 | <3000 | Y |
| 1/14/2019 | Enzyme | 442.30 | N/A | Y |

42.     Importantly, Beech-Nut only tested arsenic content in its ingredients, not its final product.  Testing of Beech-Nut's ingredients shows that the company used at least fourteen ingredients containing over 300 ppb arsenic.  And, Beech-Nut, used at least 45 ingredients containing over 100 ppb arsenic— more than 10 times the maximum level of inorganic arsenic for drinking water set by the EPA.[47]

43.     On June 8, 2021, Beech-Nut issued a voluntary recall of its "Beech-Nut Stage 1, Single Grain Rice Cereal."[48]  This recall is the result of a sampling program conducted by the State of Alaska which found that "Beech-Nut Stage 1, Single Grain Rice Cereal" contained over 100

---

[46] *Id.*
[47] *Id.*
[48] FDA, *Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment* (https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and) (last visited on July 7, 2021).

ppb inorganic arsenic.[49]   The recalled products were distributed nationally through retail stores and online.[50]

44.     In addition to the voluntary recall, Beech-Nut announced that it will exit the market due to concerns about its ability to obtain rice flour containing less than 100 ppb inorganic arsenic.[51]

**B.     <u>Beech-Nut's Baby Food Products Contain Lead.</u>**

45.     There is no federal standard for lead in baby food.   However, standards for the levels of lead in drinking water have been imposed by agencies, including the FDA (limit of 5 ppb) and EPA (15 ppb).   The FDA also provides guidance for lead measurements in juice and candy with a maximum level of 100 ppb.[52]   Additionally, WHO provides that levels of lead in drinking water should not exceed 5 ppb.

46.     Health experts, including the AAP, Consumer Reports, and the EDF advocated for a maximum limit of 1 ppb in baby food.[53]

47.     Accordingly, the Congressional Subcommittee used the following guidance when reviewing baby food manufacturers' internal test results:

---

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] **<u>Exhibit A</u>** at p. 21.
[53] *Id.*

*Proposed and Existing Lead Standards*

| Group or Agency | Standard |
|---|---|
| Environmental Defense Fund | 1 ppb, especially for baby food |
| Consumer Reports | 1 ppb in fruit juices |
| American Academy of Pediatrics (AAP) | 1 ppb for water fountains in schools |
| FDA | 5 ppb for bottled water |
| World Health Organization | 10 ppb provisional guideline |
| EPA | 15 ppb for drinking water (action level) |
| European Union (EU) | 20 ppb for "infant formulae and follow-on formulae" |
| FDA | 50 ppb for juice<br>100 ppb for candy |

48.     Beech-Nut set an internal specifical limit of 5,000 ppb for lead in certain ingredients, far surpassing any existing standard.[54]

49.     The Congressional Report determined that Beech-Nut manufactured and sold Baby Food Products with levels exceeding all existing standards for lead, including those set for juice and candy, which allow a maximum measurement of 50 ppb and 100 ppb respectively.

50.     Beech-Nut does not test its finished products and instead only tests the ingredients used.  Nevertheless, testing of Beech-Nut's ingredients proves that the company sold products with amounts of lead that significantly exceed the existing standards for water, juice, and candy. Specifically, the results revealed: (a) Beech-Nut tested and used 57 ingredients that contained over 20 ppb lead, (b) Beech-Nut accepted 89 ingredients that tested at or over 15 ppb lead, and (c) Beech-Nut accepted 483 ingredients that tested at or over 5 ppb lead.[55]

51.     The below chart illustrates the top ten raw materials containing lead that Beech-Nut used as ingredients in its Baby Food Products:

---

[54] *Id.*
[55] *Id.* at pp. 26-27.

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[60]

| Date | Commodity | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|------|-----------|-------------------|-------|------------------|
| 10/19/2016 | Cinnamon | 886.9 | ≤1000 | Y |
| 5/21/2018 | Org. Cumin | 644.9 | ≤1000 | Y |
| 8/11/2017 | Org. Coriander | 603.5 | <1000 | Y |
| 10/11/2016 | Oregano | 570.4 | <1000 | Y |
| 7/14/2017 | Org. Cumin | 231.2 | ≤1000 | y |
| 5/31/2017 | Cinnamon | 203.9 | ≤1000 | Y |
| 3/30/2017 | Cumin | 177.7 | ≤1000 | Y |
| 11/3/2017 | Org. Cumin | 167.7 | ≤1000 | Y |
| 12/5/2017 | Org. Cinnamon | 126.2 | ≤1000 | Y |
| 11/29/2017 | Alpha Amylase | 114.5 | <300 | Y |

### C.   **Beech-Nut's Baby Food Products Contain Cadmium.**

52.     There is no federal standard for cadmium in baby food.  Standards for cadmium levels in drinking water have been imposed by both the FDA and the EPA.  Both agencies impose a limit of 5 ppb.[56]  Additionally, WHO imposes a limit of 3 ppb.

53.     Nonprofit organizations have also issued recommendations.  Consumer Reports recommends a limit of 1 ppb for cadmium in fruit and juices, while Healthy Babies Bright Futures suggests 0 ppb.[57]  Consumer Reports and the EDF, advocate for levels of less than 1 ppb.[58]  Accordingly, the Congressional Subcommittee used the following guidance when reviewing Defendant's internal test results:

---

[56] *Id*. at p. 29.
[57] *Id.*
[58] *Id.*

19

*Proposed and Existing Cadmium Standards*

| Group or Agency | Standard |
| --- | --- |
| Consumer Reports | 1 ppb in all fruit juices |
| World Health Organization | 3 ppb for drinking water |
| EPA | 5 ppb for drinking water |
| FDA | 5 ppb for drinking water |
| European Union (EU) | 5-20 ppb for infant formulae |

54. Beech-Nut set an internal specifical limit of 3,000 ppb for cadmium in certain ingredients, far surpassing any existing standard.[59]

55. The Congressional Report determined Defendant manufactured and sold Baby Food Products with levels exceeding all existing recommended limits.

56. Beech-Nut does not test its finished products and instead only tests the ingredients used. The ingredients tested shows that the company sold products with levels of cadmium that exceed the existing standards. Specifically, the results revealed: (a) Beech-Nut used twenty ingredients registering more than 100 ppb cadmium, and (b) at least 105 ingredients that Beech-nut tested and used in its Baby Food Products registered over 20 ppb cadmium.[60]

57. The below chart illustrates the top ten raw materials containing cadmium that Beech-Nut used as ingredients in its Baby Food Products:

---

[59] *Id.*
[60] **Exhibit A** at pp. 30-31.

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[73]

| Date | Commodity | Cadmium Result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|
| 10/19/2016 | Cinnamon | 344.50 | ≤1000 | Y |
| 4/11/2018 | Org. Cinnamon | 225.10 | ≤1000 | Y |
| 5/31/2017 | Cinnamon | 194.30 | ≤1000 | Y |
| 6/8/2018 | Org. Garlic | 186.00 | ≤1000 | Y |
| 8/11/2017 | Org.Cinnamon | 178.20 | ≤1000 | y |
| 10/11/2016 | Oregano | 176.50 | <1000 | Y |
| 12/5/2017 | Org. Cinnamon | 163.40 | ≤1000 | Y |
| 11/29/2017 | Dehydrated Potato | 148.40 | <90 | Y - ER |
| 10/10/2018 | Dehydrated Potato | 146.00 | <90 | Y |
| 10/10/2018 | Dehydrated Potato | 143.50 | <90 | Y - ER |

### D.   Beech-Nut Does Not Even Test Its Baby Food Products For Mercury.

58.     There is no federal standard for the level of mercury in baby food.  The EPA imposes a standard requiring that levels of mercury in drinking water not exceed 2 ppb.[61]

59.     Consumer advocate, Healthy Babies Bright Futures recommends a level of mercury of 0 ppb.

60.     The Congressional Subcommittee used the EPA's limit of 2 ppb as guidance when reviewing Defendant's internal test results.

61.     The Congressional Report found that Beech-Nut does not test its ingredients or finished products for Mercury.[62]

## III.   BEECH-NUT DISREGARDED AND IGNORED REPORTS DETECTING THE PRESENCE OF TOXIC HEAVY METALS IN ITS BABY FOOD PRODUCTS.

62.     For years, Beech-Nut has possessed medical and scientific data linking childhood exposure to Toxic Heavy Metals to long-term and irreversible health and cognitive issues.

[61] **Exhibit A** at p. 48.
[62] *Id*. at p. 32.

63.     On December 6, 2017, Happy Babies Bright Futures issued a report finding rice-based infant cereals, including Beech-Nut's cereals, contained 84% more arsenic than non-rice multigrain products ("Arsenic Report").[63]

64.     In 2017, EDF issued a report finding lead in 1 in 5 samples of baby food.  The EDF based its analysis on data from 2,164 baby food samples collected by the FDA between 2003 and 2013[64] as part of the agency's Total Diet Study ("TDS") program, which has monitored the United States population's average annual dietary intake of levels of certain contaminants and nutrients since the 1960s.[65]  Overall, the EDF "found that more than 1 million children consume more lead than FDA's limit" and estimated that the removal of lead in baby food "would save society more than $27 billion annually in total lifetime earnings from saved IQ points."[66]  The EDF also recommended that manufacturers set a goal of less than 1 ppb of lead in baby food and test more frequently during processing to identify additional lead sources and take appropriate corrective actions.

65.     On August 16, 2018, Consumer Reports revealed the findings of its analysis of 50 nationally distributed baby food products manufactured by Beech-Nut and several other manufacturers.  Consumer Reports found measurable levels of Toxic Heavy Metals in all 50 products, noting that about two-thirds (68%) contained concerning amounts of at least one Toxic

---

[63] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (Dec. 2017) (https://www.healthybabycereals.org/sites/healthybabycereals.org/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on July 7, 2021).

[64] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited July 7, 2021).

[65] To conduct TDS, the FDA purchases samples of diverse types of foods four times a year, in different regions of the United States.  The food samples are prepared in the same manner consumers typically would and analyze for levels of chemical contaminants and chemical elements, including Toxic Heavy Metals.  The FDA uses the results to calculate the estimated consumption of each contaminant and nutrient annually.  Results of the TDS, from 1991 to present, are publicly available on the FDA's website (https://www.fda.gov/food/total-diet-study/total-diet-study-fact-sheet-industry)

[66] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited July 7, 2021).

Heavy Metals, and 15 of the foods posed a potential health risk by eating one serving of the product or less, per day.  The results further established "all the samples of Beech-Nut Classics Sweet Potatoes … had concerning levels of lead."[67]

66.     In April 2019, Healthy Babies Bright Futures published a report finding that 95% of the products tested contained dangerous amounts of Toxic Heavy Metals.[68]  Notably, Healthy Babies Bright Futures' Report found Toxic Heavy Metals in the same Baby Food Products at issue in this case, among others.  For example, Beech-Nut's Oatmeal Whole Grain Baby Cereal contained significant levels of arsenic, lead, and cadmium.[69]

67.     The Healthy Babies Bright Futures Report results are consistent with the FDA's findings in 2017, in which the FDA detected one or more Toxic Heavy Metal in 33 of 39 baby food samples, several of which are Beech-Nut products.[70]  Additionally, while the FDA proposed limiting inorganic arsenic in infant rice cereals to 100 ppb, the Healthy Babies Bright Futures report noted that four of the seven infant rice cereals they analyzed during its study detected amounts exceeding 100 ppb.[71]

## IV.   BEECH-NUT'S ADVERTISEMENTS FALSELY CLAIM THAT ITS BABY FOOD PRODUCTS ARE SAFE, AND FRAUDULENTLY OMIT ALL MATERIAL INFORMATION ABOUT TOXIC HEAVY METALS

68.     Defendant manufactures, distributes, and sells Baby Food Products under the brand name "Beech-Nut."  The company proudly declares to consumers that it has "taken the responsibility to provide safe, nutritious food as our highest purpose for over 130 years."[72]

---

[67] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018) (https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/) (last visited on July 7, 2021).
[68] Healthy Babies Bright Futures, *What's in my Baby's Food?*  (Dec. 2017) (https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf) (last visited on July 7, 2021).
[69] *Id*. at 19.
[70] *Id.* at 6.
[71] *Id.*
[72]  https://www.beechnut.com/food-quality-safety/ (last visited on July 7, 2021).

69.     Beech-Nut uniformly markets, advertises, represents, and warrants its products as safe and suitable for babies' consumption and in compliance with FDA guidelines.

70.     Beech-Nut misleads consumers by representing that the company performs tests for "up to 255 contaminants to confirm that every shipment meets [its] strict quality standards." However, as noted in the Congressional Report, Beech-Nut does not test for mercury, and has among the lowest standards in the industry for lead and cadmium.[73]







71.     Beech-Nut fails to disclose to the consumer that it has adopted a reckless policy that only tests ingredients used in products rather than the finished product.

72.     Consumers reasonably rely upon Beech-Nut's statements, representations, and advertisements regarding the safety of its product.  They would have no reason to suspect the presence of Toxic Heavy Metals in Beech-Nut products or take necessary precautions.

73.     Beech-Nut's products' labels include a representation that the company does not use harmful ingredients such as cancer-causing bisphenol A ("BPA") but fails to disclose or warn

---

[73] **Exhibit A** at pp. 31, 37-38.

consumers that Beech-Nut's products contain Toxic Heavy Metals.  Instead, Beech-Nut maintains

that its products are of the highest quality and fails to warn consumers of the dangers.

74.     The following image is a representative example of Beech-Nut's "Non-GMO"

verification and misleading label for Beech-Nut Sweet Potato:

 

75.     The following image is a representative example of Beech-Nut Single Grain Rice

Baby Cereal's label:



76.     Despite unequivocal proof of Toxic Heavy Metals in its foods, Beech-Nut continues to mislead its customers in its response to the Congressional Report's findings:

> **The health and safety of your children is at the heart of what we do.**
>
> We know moms, dads, and caregivers depend on our commitment to safety and quality to help keep their children thriving. As parents ourselves, we are proud to feed our own children Beech-Nut products and have taken the responsibility to provide safe, nutritious food as our highest purpose for over 130 years.
>
> We understand the recent Congressional Report and news stories have been unsettling to parents. We must continue to reduce heavy metal contaminants and continue developing science-based standards for limiting heavy metals found in baby food ingredients—In fact, for several years, Beech-Nut have worked with the U.S. Food and Drug Administration, through the Baby Food Council, on this very issue.
>
> On March 5, 2021, the FDA issued an update to provide parents and caregivers information about the **safety** of current baby food and the importance of serving a **variety** of healthy foods to infants and toddlers. Here are some **key takeaways** from this FDA update that may address your biggest questions:
>
> - **Is my baby's food safe?** Yes, the food is safe. The FDA regulates and routinely monitors levels of heavy metals in all foods. If the FDA finds that any foods pose a health risk, it takes steps to remove those foods from the market.
>
> - **Is homemade baby food safer for my baby?** Making food at home for your child likely does not reduce his or her potential exposure to metals. Rather, it may result in higher exposures, as the ingredients you use are not tested. Food manufacturers implement sophisticated testing tools & procedures that help detect & select ingredients with lower concentrations of elements, such as heavy metals.
>
> - **Should I throw out Beech-Nut baby food?** The FDA does not advise parents and caregivers to throw out packaged foods for babies and young children.
>
> - **Should I eliminate certain foods from my child's diet?** The FDA advises that eliminating food groups from your child's diet could lead to deficiencies in certain nutrients and potential poor health outcomes. Before eliminating any food items, parents and caregivers should speak with their child's pediatrician about a diet that includes a variety of age-appropriate, healthy foods to ensure that the child is getting the nutrients he or she needs.
>
> - **Where do heavy metals come from?** Heavy metals are found naturally in our environment. They are in the soil, the water, the air— and are therefore unavoidable in our general food supply.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class:

> **Class**: All persons who purchased one or more of Defendant's products containing Toxic Heavy Metals, in the United States for personal/household use.[74]

78.     Plaintiff seeks certification on behalf of the following New Jersey Subclass.[75]

> **New Jersey Subclass**:  All persons residing in New Jersey who purchased one of more of Defendant's products containing Toxic Heavy Metals for personal/household use.

---

[74] Plaintiff reserves the right to re-define the Class definition prior to class certification and after having the opportunity to conduct discovery.

[75] As described above, the Nationwide Class and Subclass are collectively to as "Class" unless otherwise noted. *See* n. 2.

79.   **Excluded from the Class are**: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) the Defendant, Defendant's subsidiaries, parents, successors, predecessors, any entities in which the Defendant has a controlling interest, and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

80.   **Numerosity (Rule 23(a)(1))**:   The exact number of members of the Class is unknown and currently unavailable to Plaintiff, but joinder of individual members herein is impractical.  The Class is likely comprised of hundreds of thousands of consumers.  Sales figures indicate that millions of individuals purchased Beech-Nut's Baby Food Products.  The precise number of Class members, and their addresses, is unknown to Plaintiff at this time, but can be ascertained from Defendant's records and/or retailer records.  The members of the Class may be notified of the pendency of this action by mail or email, internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

81.   **Predominant Common Questions (Rule 23(a)(2))**:  The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  The common and legal questions include, without limitation:

a.    Whether Defendant knew or should have known that its Baby Food Products contained Toxic Heavy Metals that rendered Defendant's Baby Food Products unsafe for babies;

b.    Whether Defendant wrongfully represented and continues to represent that its Baby Food Products are safe for babies' consumption;

c.    Whether Defendant's representations, advertisements, warranties, labeling, packaging, and logos are false, deceptive, and misleading;

d.   Whether Defendant had knowledge that those representations were likely to deceive a reasonable consumer;

e.   Whether Defendant had knowledge that those representations were false, deceptive, or misleading;

f.   Whether Defendant continue to disseminate those false, misleading, and deceptive representations;

g.   Whether Defendant failed to warn and disclose material facts regarding its Baby Food Products and concealed internal testing results revealing dangerous levels of arsenic, lead, cadmium, mercury, and other heavy metals that are unsafe for babies;

h.   Whether Defendant's testing showed that Defendant's products contained Toxic Heavy Metals;

i.   Whether Defendant violated the laws of the State of New York;

j.   Whether Defendant violated the state consumer protection statutes alleged herein;

k.   Whether Defendant was unjustly enriched; and

l.   The nature of relief, including damages and equitable relief, to which Plaintiff and members of the Class are entitled.

82.   **Typicality of Claims (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class members, purchased Defendant's Baby Food Products, suffered damages as a result of that purchase, and seeks the same relief as the proposed Class members.

83.   **Adequacy of Representation (Rule 23(a)(4))**: Plaintiff adequately represents the Class because her interests do not conflict with the interests of the members of the Class, and she has retained counsel competent and experienced in complex class action and consumer litigation.

84.     Plaintiff and her counsel will fairly and adequately protect the interest of the members of the Class.

85.     **Superiority (Rule 23(b)(3))**: A class action is superior to other available means of adjudication for this controversy.  It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiff and the members of the Classes are relatively small compared to the cost of individually litigating their claims.  Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system.  A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

### Declaratory Relief
### (Fed. R. Civ. P. 23(b)(1) and (2))

86.     In the alternative, this action may properly be maintained as a class action because:

    a.   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; or

    b.   the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

    c.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## Issue Certification (Fed. R. Civ. P. 23(c)(4))

87.     In the alternative, the common questions of fact and law, set forth in Paragraph 81 are appropriate for issue certification on behalf of the proposed Class.

## CAUSES OF ACTION

### COUNT  I
### BREACH OF EXPRESS WARRANTY
*(On behalf of Plaintiff and the Class against Defendant)*

88.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as fitfully set forth here.

89.     Plaintiff brings this claim on behalf of herself and members of the Class.

90.     Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain.  Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description.

91.     Plaintiff and members of the Class formed a contract with the Defendant at the time they purchased Defendant's Baby Food Products.  The terms of that contract included the promises and affirmations of fact that Defendant made through its product labels, through other forms of uniform, nationwide marketing, its website, and on social media.  Among other affirmations of fact and promises described herein, Defendant represented that its Baby Food Products were and are safe, healthy, and appropriate for infant or child consumption.

92.     These affirmations of facts and promises, which are part of Defendant's uniform marketing, advertising, and product labeling, constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiff and members of the Class on the one hand, and the Defendant, on the other.

93.     Contrary to these affirmations of fact and promises, Defendant's Baby Food Products did not and do not contain food or beverages that are safe, healthy, and appropriate for infant or child consumption as described on the product labels or in Defendant's marketing and advertising campaign.

94.     Defendant breached the express warranties and/or contract obligations by placing these Baby Food Products into the stream of commerce and selling them to consumers, when they have dangerous and/or Toxic Heavy Metals, and can cause toxicity or adverse health implications, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Defendant.  The high levels of Toxic Heavy Metals substantially impair the use, value, and safety of Defendant's Baby Food Products.

95.     At all times relevant herein, Defendant was aware, or should have been aware, of Toxic Heavy Metals in Defendant's Baby Food Products.  Defendant was on notice of these concerns with its products, but nowhere on the package labeling or on Defendant's website or other marketing materials did Defendant warn Plaintiff and members of the Class that they were at risk of feeding their children food with levels of Toxic Heavy Metals that exceed the standards set by federal agencies or recommended by other organizations.

96.     Instead, Defendant concealed the high levels of heavy metals contained in Defendant's Baby Food Products and deceptively represented that these products were safe, healthy, and appropriate for infant or child consumption.  Defendant, thus, utterly failed to ensure that the material representations it was making to consumers were true.

97.     The toxic and/or dangerous levels of heavy metals at issue in Defendant's Baby Food Products existed when they left Defendant's possession or control and were sold to Plaintiff and members of the Class.  The levels of heavy metals contained in the Defendant's Baby Food

Products were undiscoverable by Plaintiff and members of the Class at the time of purchase of Defendant's Baby Food Products.

98.     As a manufacturer, marketer, advertiser, distributor, and seller of Defendant's Baby Food Products, Defendant has exclusive knowledge and notice of the fact that these products did not conform to the affirmations of fact and promises.

99.     In addition, or in the alternative, to the formation of an express contract, Defendant made each of the above-described representations to induce Plaintiff and members of the Class to rely on such representations.

100.    Defendant's affirmations of fact and promises were material, and Plaintiff and members of the Class reasonably relied upon such representations in purchasing the Defendant's Baby Food Products.

101.    Affording Defendant an opportunity to cure its breaches of written warranties would be unnecessary and futile here.  Defendant was placed on reasonable notice of the levels of heavy metals in Defendant's Baby Food Products and breach of the warranties based on its scientific research and expertise in the food production industry.  Defendant has had ample opportunity to cure the high level of heavy metals in its Baby Food Products to render them safe and healthy consumption by Plaintiff and members of the putative classes and their children but has failed to do so.

102.    Defendant has also had notice of its breach as set forth herein by virtue of the recent Congressional investigation into this matter and the prior 2019 report issued by Healthy Babies Bright Future.

103.    As a direct and proximate result of Defendant's breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products

as specifically warranted by Defendant.  Plaintiff and members of the Class did not receive the

benefit of the bargain and suffered damages at the point of sale stemming from their overpayment

of Defendant's Baby Food Products.

## COUNT  II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
*(On behalf of Plaintiff and the Class against Defendant)*

104.    Plaintiff incorporates by reference all allegations in this Complaint and restates

them as if fully set forth herein.

105.    Plaintiff brings this claim on behalf of herself and members of the Class.

106.    Defendant is a merchant engaging in the sale of goods to Plaintiff and members of

the Class.

107.    There was a sale of goods from Defendant to Plaintiff and members of the Class.

108.    Defendant's Baby Food Products were sold to Plaintiff and members of the Class

purchased Defendant's Baby Food Products from authorized resellers of Defendant's Baby Food

Products.

109.    By placing Defendant's Baby Food Products into the stream of commerce,

Defendant impliedly warranted to Plaintiff and members of the Class that Defendant's Products

were of merchantable quality (i.e., a product of high-enough quality to make it fit for sale, usable

for the purpose it was made, of average worth in the marketplace, or not contaminated or flawed

or containing a defect affecting the safety of the product), would pass without objection in the

trade or business, and were free from material defects, and reasonably fit for the use for which they

were intended.

110.    Defendant's products when sold, and at all times thereafter, were not merchantable or reasonably fit for either the use they were intended or the uses reasonably foreseeable by Defendant.

111.    Defendant breached the implied warranty of merchantability because Defendant's Baby Food Products suffer from the presence of Toxic Heavy Metals, such as arsenic, lead, cadmium, and mercury, which have the propensity to cause health complications, rendering them unfit for their intended use and purpose as baby and/or children's food and beverages.  The level of Toxic Heavy Metals substantially impairs the use, value, and safety of these products.

112.    The toxic and/or dangerous levels of heavy metals existed when the Defendant's Baby Food Products left Defendant's possession or control and were sold to Plaintiff and members of the putative classes. The amounts of Toxic Heavy Metals contained in Defendant's Baby Food Products were undiscoverable by Plaintiff and members of the putative classes at the time of their purchase.

113.    As described herein, Defendant advertised on its Baby Food Product labels, on its website, and through a national advertising campaign, among other means, that Defendant's Baby Food Products were and are safe and appropriate for infant and child consumption.

114.    Contrary to these representations, Defendant's Baby Food Products possessed dangerous levels of Toxic Heavy Metals which were not revealed on Defendant's Baby Food Products, the corresponding product labels, or in Defendant's marketing and advertising campaigns.  Rather, Defendant's Baby Food Products are unsafe because they have dangerous levels of Toxic Heavy Metals.  The Baby Food Products are unsafe and unsuitable for consumer use as marketed by Defendant.  Defendant has exclusive knowledge of material facts concerning the defective nature of Defendant's Baby Food Products.

115.     Plaintiff and members of the Class, at all relevant times, were intended third-party beneficiaries of Defendant and its agents in the distribution and sale of Defendant's Baby Food Products.  Moreover, Defendant exercises substantial control over which outlets can carry and sell Defendant's Baby Food Products, which are the same places that Plaintiff and members of the Class purchased them.  In addition, Defendant's warranties are in no way designed to apply to the distributors that purchase these products in bulk and then sell them on an individual basis to each consumer.  Individual consumers are the ones who ultimately review the labels prior to making their purchasing decisions.  As a result, these warranties are specifically designed to benefit the individual consumers who purchase Defendant's Baby Food Products.

116.     Plaintiff and members of the Class sustained damages as a direct and proximate result of Defendant's breaches insofar as they paid a premium for Defendant's Baby Food Products that they would not have otherwise paid had they known that Defendant's Baby Food Products contained dangerous levels of Toxic Heavy Metals.

117.     Plaintiff and members of the Class did not receive the value of the product they paid for.  The products are worthless or worth far less than Defendant represents due to the presence of Toxic Heavy Metals contained therein which have the propensity to cause adverse health implications.

118.     Plaintiff and members of the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

119.     Defendant was placed on reasonable notice of the high levels of Toxic Heavy Metals contained in Defendant's Baby Food Products and its breach of the warranties based on its own research into food processing and sourcing, as well as a recent Congressional investigation on the matter.  Defendant has had ample opportunity to cure the dangerous levels of Toxic Heavy

Metals for Plaintiff and members of the Class but have failed to do so.  Instead, Defendant doubled down on efforts to convince consumers that its Baby Food Products are safe to consume and healthy for babies and children, including public statements denying that there are any issues with its Baby Food Products.

120.    As a result of the breach of the implied warranty of merchantability, Plaintiff and members of the Class are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

**COUNT  III**
**NEGLIGENT MISREPRESENTATION**
*(On behalf of Plaintiff and the Class against Defendant)*

121.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

122.    Plaintiff brings this claim on behalf of herself and the Class.

123.    Defendant directly, or through its agents and employees, made false representations, concealments, and non-disclosures to Plaintiff and members of the Class about its products' safety and testing.

124.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and members of the Class to purchase Defendant's Baby Food Products.

125.    In making these false, misleading, and deceptive representations and omissions, Defendant knew that consumers would purchase its products. Defendant intended for these statements to induce consumers to purchase its Baby Food Products.  Consumers who purchased Defendant's Baby Food Products paid a premium for these products over what consumers would

have paid had Defendant disclosed that its Baby Food Products contained dangerous levels of Toxic Heavy Metals.

126.    Defendant created a special relationship with Plaintiff and members of the Class through representations regarding its product safety and the Defendant's rigorous, scientific testing and research.

127.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive statements, representations, and omissions, Defendant injured Plaintiff and members of the Class in that they purchased, paid a premium price for, and fed their children the Baby Food Products, which were not as represented.

128.    In making the misrepresentations of fact and omissions to Plaintiff and members of the Class, Defendant has failed to fulfill its duty to disclose material facts about its Baby Food Products.

129.    The failure to disclose the true nature of the products' safety, testing, and compliance with internal safety thresholds was caused by Defendant's negligence and carelessness.

130.    Defendant, in making these misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the misrepresentations were not true.

131.    Defendant made and intended the misrepresentations to induce the reliance of Plaintiff and Class members.

132.    Defendant allowed its packaging, labels, advertisements, promotional materials, and website to intentionally mislead consumers, such as Plaintiff and members of the Class.

133.    Plaintiff and members of the Class did in fact rely on these misrepresentations and purchased Defendant's Baby Food to their detriment. Given the deceptive manner in which

Defendant advertised, represented, and otherwise promoted the Baby Food Products, Plaintiff's and members of the Class's reliance on Defendant's misrepresentations was justifiable.

134.    As a direct and proximate result of Defendant's conduct, Plaintiff and members of the Class have suffered actual damages.  Plaintiff and members of the Class purchased products that are worth less than the price they paid, and they would not have purchased Defendant's Baby Food Products at all had they known of the presence, or risk of the presence of Toxic Heavy Metals in the Baby Food Products that do not conform to the products' labels, packaging, advertising, and statements.

135.    Plaintiff and members of the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**<u>COUNT  IV</u>**
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349**
*(On behalf of Plaintiff and the Class against Defendant)*

136.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

137.    New York General Business Law Section 349(a) ("Gen. Bus. Law § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

138.    Plaintiff and the Class members are "person[s]" within the meaning of N.Y. Gen. Bus. Law §349(h).

139.    Defendant is a "person, firm, corporation or association" within the meaning of N.Y. Gen. Bus. Law §349(b).

140.    The conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of Gen. Bus. Law § 349, and as such, Plaintiff and the Class seek monetary

damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting its Baby Food Products. There is no adequate remedy at law. Defendant misleadingly, inaccurately, and deceptively marketed its Baby Food Products to consumers as safe and concealed information about the presence of Toxic Heavy Metals, including levels that exceed FDA and EPA guidance.

141.    Defendant made affirmative misrepresentations to Plaintiff and members of the Class that Defendant's Baby Food Products were safe and suitable for consumption. Defendant, however, concealed, and suppressed material facts concerning Defendant's Baby Food Products, including that Defendant's Baby Food Products were unsafe and unsuitable for babies; that they contained Toxic Heavy Metals; the level of the Toxic Heavy Metals; that internal testing showed that Defendant's Baby Food Products contained Toxic Heavy Metals; and that Defendant's policies permitted the sale of products with harmful levels of Toxic Heavy Metals.

142.    Defendant had an ongoing duty to Plaintiff and members of the Class to refrain from unfair and deceptive practices. Specifically, Defendant owed Plaintiff and Class members a duty to disclose all the material facts regarding Defendant's Baby Food Products, including that such products contained unsafe levels of Toxic Heavy Metals because Defendant possessed exclusive knowledge, intentionally concealed the facts regarding Baby Food Products, including that such products contained unsafe levels of Toxic Heavy Metals and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

143.    Plaintiff and members of the Class had no way of discerning that Defendant's representations were false and misleading because members of the Class did not have access to Defendant's internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

144.    Defendant thus violated Gen. Bus. Law § 349 by making statements that when considered from the perspective of the reasonable consumer conveyed that Defendant's Baby Food Products were safe and suitable for babies.  Defendant failed to disclose or warn that Defendant's Baby Food Products were unsafe and unsuitable for children, that they contained heavy metals, the levels of the heavy metals, that internal testing showed that the products contained harmful heavy metals, and that Defendant's policies permitted the sale of products with harmful levels of heavy metals. Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the Defendant's Baby Food Products with intent to mislead Class members.  Defendant knows or should have known that its conduct violated Gen. Bus. Law § 349.

145.    Defendant owed the Class a duty to disclose the true and unsafe nature of the Defendant's Baby Food Products.

146.    Defendant's concealment of the true characteristics of the Defendant's Baby Food Products was material to Plaintiff and members of the Class.

147.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and members of the Class, about the true nature of Defendant's Baby Food Products.

148.    Plaintiff and members of the Class would not have purchased Defendant's Baby Food Products had they known that the products were unsafe and unsuitable for babies, that they contained Toxic Heavy Metals, the levels of Toxic Heavy Metals, that Defendant's testing showed that Defendant's Baby Food Products contained Toxic Heavy Metals, or that Defendant's policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

149.     Defendant's violations present a continuing risk to Plaintiff and the Class as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

150.     Plaintiff and members of the Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and concealment of and failure to disclose material information.  Defendant had an ongoing duty to all customers and the public to refrain from unfair and deceptive practices.

151.     Defendant's advertising and products' packaging and labeling induced Plaintiff and members of the Class to buy Defendant's products and to pay a premium price for them.

152.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a), and Plaintiff and the Class have been damaged thereby.

153.     As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and members of the Class are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, attorneys' fees and costs, and an order enjoining Defendant's deceptive and unfair conduct, and all other just and appropriate relief available under the statute.

## COUNT  V
### VIOLATIONS OF THE NEW YORK DECEPTIVE SALES PRACTICE ACT
### New York Gen. Bus. Law § 350, *et seq.*
### *(On behalf of Plaintiff and the Class against Defendant)*

154.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

155.    N.Y. Gen. Bus. Law § 350 provides, in part, that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

156.    N.Y. Gen. Bus. Law § 350a (1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

157.    Defendant made statements and omissions that were untrue or misleading. Defendant disseminated such statements through New York.  Defendant disseminated such statements and omissions through advertising, marketing, and other publications.  Defendant knew or through the exercise of reasonable care should have known that such statements and omissions were untrue and misleading.

158.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions regarding the safety of Defendant's Baby Food Products.

159.    Defendant made numerous material and affirmative misrepresentations and omissions of fact with intent to mislead and deceive concerning Defendant's Baby Food Products, particularly concerning their unsafe nature.  Specifically, Defendant intentionally concealed and suppressed material facts concerning Defendant's Baby Food Products, namely, that they were unsafe and unsuitable for babies, that they contained Toxic Heavy Metals, that Defendant's testing showed that its products contained Toxic Heavy Metals, and that Defendant's policies permitted

the sale of products with Toxic Heavy Metals.  Defendant intentionally and grossly defrauded and misled Class members concerning the true and unsafe nature of the Defendant's Baby Food Products.

160.    Defendant made untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

161.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

162.    Defendant made the material misrepresentations described in this Complaint in Defendant's advertising, and on the products' packaging and labeling.

163.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the products for purposes of consumption were and continue to be exposed to Defendant's material misrepresentations and omissions.

164.    Plaintiff and members of the Class would not have purchased Defendant's Baby Food Products had they known that the products were unsafe and unsuitable for babies, that they contained Toxic Heavy Metals, the levels of Toxic Heavy Metals they contained, that Defendant's testing showed that its products contained Toxic Heavy Metals, or that Defendant's policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

165.    Defendant's violation presents a continuing risk to Plaintiff and members of the Class.  Defendant's deceptive acts and practices affect the public interest.

166.    Plaintiff and members of the Class have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's violation.

167.     The Class members seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 for each Class member, and because Defendant's conduct was committed willingly and knowingly, Class members are entitled to recover three times actual damages, up to $10,000.  The Class also seeks an order enjoining Defendant's false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**COUNT  VI**
**UNJUST ENRICHMENT**
*(On behalf of the Plaintiff and the Class against Defendant)*

168.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

169.     Plaintiff brings this claim on behalf of herself and the Class.

170.     Plaintiff and the other members of the Class conferred benefits on Defendant by purchasing the Defendant's Baby Food Products.

171.     Defendant received the benefits to the detriment of Plaintiff and the other members of the Class because Plaintiff and the other members of the Class purchased a mislabeled product that is not what they bargained for and did not provide the advertised benefit.

172.     Defendant has been unjustly enriched in retaining the revenues derived from the purchases of Defendant's Baby Food Products by Plaintiff and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased Defendant's Baby Food Products had they known that they contained dangerous levels Toxic Heavy Metals.

173.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the putative classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and all members of the putative classes for unjust enrichment, as ordered by the Court.

**COUNT VII**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-1, et. seq.**
***(On behalf of the Plaintiff and the New Jersey Sub-Class against Defendant)***

174.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

175.    Defendant's representations related to the Baby Food Products, as described herein, are advertisements as defined by N.J. Stat. Ann. § 56:8-1(a).

176.    The Baby Food Products sold by Defendant is merchandise as defined in N.J. Stat. Ann. § 56:8-1(c).

177.    Defendant is a person as defined in N.J. Stat. Ann. § 56:8-1(d).

178.    Defendant misrepresented the true quality and ingredients of the Baby Food Products. The false statements regarding the quality and ingredients were untrue, misleading, and deceptive, inducing Plaintiff and other consumers to spend more for Baby Food Products that have lower quality than represented.

179.    The misrepresented quality and ingredients of the Baby Food Products is a material fact to Plaintiff and other consumers because it is directly related to quality, and because Defendant recognize the materiality as evidenced by their prominent placement on Defendant's labels, packaging, and advertising.

180.    Defendant failed to disclose the presence of risk of heavy metals in the Baby Foods Products.  These were material facts that Defendant omitted from the packaging of the Baby Food

Products.  Consumers, including Plaintiff and the New Jersey Sub-Class, would not have paid as much for the Baby Food Products had Defendant accurately disclosed the quality and ingredients of the Baby Food Products.  Nor could Defendant charge as much for such baby foods, as the quality and ingredients are directly related to the amount of money retailers are able to charge for baby foods.

181.    Defendant placed the false quality in labels, packaging, and advertising related to the Baby Food Products, intending that consumers would rely on those misrepresentations and purchase the Baby Food Products from Defendant.  Plaintiff and the New Jersey Sub-Class were harmed by Defendant's misrepresentations and purchased the Baby Food Products.  Had Defendant disclosed the true quality and contents, Plaintiff and members of the New Jersey Sub-Class would not have purchased the Baby Food Products or would not have been willing to pay as much for the Baby Food Products.

182.    Plaintiff members of the New Jersey Sub-Class have suffered an ascertainable loss by paying more than they would have otherwise paid – and more than Defendant would have been able to charge – for the Baby Food Products and by receiving Baby Food Products with lower quality than they were promised by Defendant and thus being denied the benefit of their bargain.

183.    As a direct and proximate result of the deceptive, fraudulent, misleading, unfair, and unconscionable practices of the Defendant set forth above, the New Jersey Plaintiff and the New Jersey Sub-Class members are entitled to a refund of all moneys acquired by Defendant for violations of N.J. Stat. Ann. § 56:8-1, any other applicable legal or equitable relief, and treble damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class, prays for relief and judgment against Defendant as follows:

a. Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

b. Awarding Plaintiff and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c. Awarding Plaintiff and the Class appropriate relief, including actual and statutory damages;

d. For punitive damages;

e. For declaratory and equitable relief, including restitution and disgorgement;

f. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

g. Awarding Plaintiff and the Class the costs of prosecuting this action, including expert witness fees;

h. Awarding Plaintiff and the Class reasonable attorneys' fees and costs as allowable by law;

i. Awarding pre-judgment and post-judgment interest; and

j. Granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  July 16, 2021                    Respectfully submitted,

                                         **E. STEWART JONES HACKER MURPHY LLP**

                                         By: _____
                                             James E. Hacker, Esq.
                                                 Bar Roll: 101888
                                             Randolph Treece, Esq.
                                                 Bar Roll: 102735
                                             Julie A. Nociolo, Esq.
                                                 Bar Roll: 519914
                                             28 Second Street
                                             Troy, NY 12180
                                             Telephone: (518) 274-5820
                                             Email:      jhacker@joneshacker.com
                                                         rtreece@joneshacker.com
                                                         jnociolo@joneshacker.com


                                         Michael P. Canty (*pro hac vice* forthcoming)
                                         Carol Villegas (*pro hac vice* forthcoming)
                                         **LABATON SUCHAROW LLP**
                                         140 Broadway
                                         New York, New York 10005
                                         Telephone: (212) 907-0700
                                         Facsimile: (212) 818-0477
                                         Email:      mcanty@labaton.com
                                                     cvillegas@labaton.com


                                         *Counsel for Plaintiff and the Proposed Class Members*